UNITED STATES of America, Plaintiff,

v.

Alexis Javier ANGUEIRA, et al., Defendants.

Cr. No. 90–55 (PG).

United States District Court,
D. Puerto Rico.

Aug. 30, 1990.

Silvia Carreño Coll, Asst. U.S. Atty., Hato Rey, Puerto Rico, for plaintiff.

Luis F. Abreu Elías, Hato Rey, Puerto Rico, for defendants.

OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

Birds of a feather flock together, or at least they did so in this case. Fourteen defendants were all charged together with violations of Section 703 of Title 16 of the United States Code, which makes it a petit offense to take or attempt to take by aid of baiting or on or over any baited area any migratory bird. The matter was tried to the Court, sitting jury-waived, in early July of 1990. After four days of trial, decision was reserved. What follows constitutes this Court's findings of fact and conclusions of law pursuant to Fed.R.Crim.P. 23(c).

*Findings of Fact*

The Government's case's flight commenced on the latter days of the month of August, 1989, when the Department of Natural Resources (D.N.R.) began receiving confidences pertaining to an alleged baiting practice that had been taking place at defendant Francisco Abreu Aldarondo's farm. *See* Government Exhibit I. The evidence presented at trial established that on August 28, 1989, at or about 6:25 P.M., a D.N.R. ranger was travelling along the road adjacent to Mr. Abreu's farm in Isabela, Puerto Rico, when he observed a young man walking through a plot of farm land which appeared recently plowed, carrying a bucket or pail, extracting from it some yellow seeds with his hands, and sprinkling them across the land with a fan-like motion. Perched a few feet away was Francisco Abreu, shouting instructions to the young man and gesturing with his hands to the areas where he wanted the grain sprinkled. At one point in time the young man interrupted his assignment and approached Mr. Abreu, who then took out a white sack from the back of his Pick-up truck and emptied it in the bucket. Upon observing the presence of the ranger, who had stopped and parked his car alongside the

road, Mr. Abreu got in his Pick-up truck and drove it out of the farm, greeting the ranger with a gesture as he drove by. He proceeded about half a kilometer down the road, then returned to pick up the young man. This time he stopped to ask the ranger what he was doing there, to which he answered that he was checking the doves' path. Mr. Abreu then made some comments regarding black doves and left. *See* Government's Exhibit 2.

The next day, at approximately 6:30 A.M., D.N.R. rangers once again visited the farm of Mr. Abreu to corroborate the baiting allegations. This time they positioned themselves in the municipal road located two farms to the west of Mr. Abreu's farm. During a period of an hour and a half, they were literally able to observe thousands of white-winged doves flying toward a baited area. The birds would position themselves at two of the farm's "mango" trees, then drop down to the ground to eat. During that same period of time, a couple of hunters stopped to talk to them and commented on the fact that the area was baited. The rangers' findings were immediately reported to their supervisors. *See* Government's Exhibit 4.

On August 30, 1989, the hunter became the hunted, and D.N.R. Rangers (after securing legal advice to that effect, *see* Government's Exhibit 6) set out to look for Francisco Abreu. They ran into him in the Jobos Ward of Road 459, close to the Pay Restaurant, as he was on his way to Aguadilla. He was ordered to stop and advised that based on the facts the rangers had witnessed at his farm during the previous two days and pursuant to the authority they derived from the hunting regulations, they were declaring his land a baited area. He was further advised that to be able to hunt in the same he was to clean the area and wait up to ten days after removing the feed. Before parting, the rangers added that hunting regulations also required that he notify the D.N.R. once these legal conditions had been met. Mr. Abreu assured the rangers that he was not about to hunt in that area and that he was fully familiar with the law. *See* Government's Exhibit 5.

In 1989, the hunting season opened on September 2. Many rangers were assigned to cover the Jobos and Bejucos Wards, including the farm of Francisco Abreu. Upon arriving at the farm shortly before 6:00 A.M., the rangers noticed that the entrance had been closed with a newly erected barbed-wire fence and signs citing provisions of the Puerto Rico Penal Code. A private, uniformed, security guard handed them a temporary restraining order dated September 1, 1989, from the Superior Court of Puerto Rico, Aguadilla Part,[1] indicating the D.N.R. that it was to permit petitioners to use the farm of the Estate of Francisco Abreu for hunting.[2] When the rangers attempted to enter the premises for the purpose of checking the hunters' weapon registrations and hunting licenses (as the law permits) they were confronted by an irate Francisco Abreu who addressed them in a most derogatory manner and tried to impede their entrance to the farm. Once inside, the agents identified areas baited with corn, took photographs and samples to be used as evidence,[3] and issued

---

**1.** After a hearing held ten days after the T.R.O. issued, the Superior Court issued a final judgment in which it noted that there had been no need for the presentation of evidence since both parties had stipulated that petitioners had agreed to "clean immediately the baited area" and that, as part of the agreement reached, Commonwealth marshals had performed an ocular inspection of the area in controversy and found that petitioners had in fact complied with the stipulation. *See* Government's Exhibit 10. It is interesting to note that, upon motion by the plaintiffs, said judgment was amended *nunc pro tunc* on October 27, 1989, *see* Defendants' Exhibit B, to substitute the words "the baited area" for the "allegedly baited area." However, petitioners apparently forgot to request that the Court also amend its judgment pertaining to their actual cleaning of the area, as that part of the Judgment remained intact.

**2.** Among the agents present was Mr. Randy Armstrong, an official from the Fish and Wildlife Service of the United States. Given the fact that Mr. Armstrong was a federal official, the local court's order did not apply to him.

**3.** An issue arose during trial pertaining to the date in which said pictures were taken. Defendants' Exhibit E–1 and E–2 are two close-up pictures of a heavily baited area showing a ranger's notebook and pen positioned on the ground next to the corn. Although the pictures

tickets to several hunters for hunting in a baited area. Men dressed in camouflage greens were hunting all over the farm, as well as all over several adjacent farms. D.N.R. agents testified that an unusually high concentration of white-winged doves were flying over the farms from the west to the east and that all hunters were positioned to the west of the baited area.[4] The baited area was in the shape of a square, approximately sixty feet long on each side. In the rangers' presence, defendants shot and killed white-winged doves some of which were seized by the rangers but could not be preserved for trial. Although documents were requested from and tickets were issued to every defendant, a tense moment arose when rangers intervened with hunter Alexis Angueira Abreu. Said hunter became very violent, uttering obscene words and making deathly threats, all the time holding a shotgun in his hands. Hunters Ramon Angueira Hernández (Angueira Abreu's father), Francisco Abreu (Angueira Hernández's brother in law), and Daniel González Rivera all joined in the act, all of them displaying similar irresponsible conduct. Tempers having flared past controllable limits, the rangers had to leave the property at or about 8:00 A.M. *See* Government's Exhibit 9.

### Conclusions of Law

Section 703 of Title 16 makes it unlawful for any person "at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill ... any migratory bird[.]" Even though, pursuant to the authority he derives from the statute, the Secretary of the Interior has promulgated regulations which allow the taking of migratory birds in limited and specific circumstances, regulation 20.21(i) of Title 50 of the Code of Federal Regulations states that no person shall take migratory birds "[b]y the aid of baiting, or on or over any baited area." As used in subparagraph (i), "baiting" means "the placing, exposing, depositing, distributing, or scattering of shelled, shucked, or unshucked corn, wheat, or other grain salt, or other feed so as to constitute for such birds a lure, attraction or enticement to, on, or over any areas where hunters are attempting to take them." *Id.* Moreover, "baited area" is defined as "any area where shelled, shucked, or unshucked corn, wheat or other grain, grain, salt or other feed whatsoever capable of luring, attracting, or enticing such birds is directly or indirectly placed, exposed, deposited, distributed or scattered." *Id.* Finally, we note that section 10.13 of Title 16 of the C.F.R. lists the white-winged dove, or *zenaida asiática*, as one of the species of birds that are to be considered migratory birds.

It is clear from the above that in order to convict defendants for violation of the regulation at issue the Government had to prove: (1) that the field in question was baited within the meaning of the regulation; (2) that by the aid of said baiting defendants took at least one bird on or over the baited area; and (3) that the captured birds were in fact migratory. It should also be clear that in this case the Government has ably and thoroughly proven every element of the offenses charged beyond a reasonable doubt. In the interest of thoroughness, however, we address each of these elements separately, writing briefly

were undoubtedly taken on September 2, 1989, the day the hunting season began and the rangers were present at the Abreu farm, the writing on the notebook mistakenly sets the date at September 9, 1989. The Court gave full credit to the Government witnesses' explanation of the mistake and our finding is further supported by the fact that the Superior Court's judgment on defendants' request for a T.R.O. clearly states that Commonwealth marshals made an ocular inspection of the farm on September 7, 1989, and found the same to be clean. *See* Defendants' Exhibit B and Government's Exhibit 10.

4. The Court wishes to point out that an aerial picture of the region taken by the Government and presented as Exhibit D is very illustrative in this regard. The photograph shows clearly the relative positions of the farms of Mr. Abreu, the Guevara family, and all other adjacent sites. The house of Mr. Abreu is clearly visible, along with the "mango" trees, the baited areas, the gates, and the municipal roads. When most of the witnesses took the stand they indicated the positions at which they were hunting, so it is easy to visualize the manner in which the hunting activities were carried out.

to discard any defenses defendants might have raised.

■ Concluding that the field in question was baited gives us no pause. The photographs that were taken of the field the day the hunting season opened speak eloquently of this aspect of the Government's case. Defendants' Exhibits E-1 and E-2. We have already stated that we give no significance to the error regarding the dates that appeared in these pictures, *see* footnote 3, supra, and, in any case, the fact that the area was baited was clearly established by the undisputed and consistent testimony of the agents who testified on the Government's behalf. What is more, even defendants themselves, albeit inadvertently, conceded the point when they requested the T.R.O. from the Superior Court of Puerto Rico, Aguadilla Part. *See* Plaintiff's Exhibit 10, Defendants' Exhibit B, and footnote 1, supra. The first element was clearly proven.

■ As to the fact that by the aid of said baiting defendants took at least one bird on or over the baited area there can also be little, if any, dispute. The rangers who were present at the Abreu farm on opening day and who appeared in court uniformly testified that each of the defendants in fact killed at least one white-winged dove in their presence and their testimony has been given full credit by the Court. *See* Government's Exhibit 11 (listing the number of birds that were seized from each defendant). Some defendants argued, however, that they were hunting as far as one-half mile (approximately 2500 feet) from the baited area and were therefore not hunting "on or over [a] baited area" within the meaning of the regulation. A quick review of the applicable case law reveals, however, that in so arguing defendants' counsel was shooting blanks. The cases have held that as long as a defendant takes a bird within the "zone of influence" exerted by the bait he has committed the very act which 50 C.F.R. Sec. 20.21(i) forbids. *Yandell v. United States*, 550 F.Supp. 572 (N.D.Miss. 1982), *aff'md*. 712 F.2d 218 (5th Cir.1983), *United States v. Delahoussaye*, 573 F.2d 910 (5th Cir.1978), *United States v. Man-*

*ning*, 787 F.2d 431, 437-438 (8th Cir.1986) (and cases cited therein). Although the "zone of influence" is a term of art, *see Manning*, at 438, in *Yandell*, the trial court found that hunting that took place within 3700 feet from the hunting area was still to be considered within its zone of influence if "it served to lure the birds 'to on or over' the place where the hunters were taking them." 550 F.Supp. at 577. In the case at bar, it is most significant that the hunters had all strategically positioned themselves to the west of the baited area so that, no matter how far away they stood, the eastbound doves necessarily had to fly over them to reach the bait. The second element was also clearly proven.

■ With regard to the classification of the white-winged dove, we should have to go no farther than Section 10.13 of Title 16 of the Code of Federal Regulations. Defendants, however, have alleged that they were relying on the information provided by the "Guide to the Hunter" ("Guía del Cazador," *see* Defendants' Exhibit C), a book published and distributed by the Department of Natural Resources of Puerto Rico and approved by the Fish and Wildlife Service of the United States, and that said book describes the white-winged dove as a resident, not migratory, bird. Undaunted, the Government called Mr. Pedro Ortiz Rosas (the author of said book) to the stand, and Mr. Ortiz explained to the satisfaction of the Court that the classification of resident means that there is a population of the species which breeds in Puerto Rico, but that that does not mean that the species as a whole is not migratory in nature, a point which is corroborated by the fact that the species is found in many countries around the world. Defendants, all experienced hunters, were no doubt aware or should have been of that fact and the Court will not allow them through a willful ignorance or accomodaticious interpretation to evade the proscriptions of the law. In any case, the regulation's wording is clear: the white-winged dove is classified as a migratory bird. 16 C.F.R. Sec. 10.13. It should require no citation of authority for us to recall that ignorance of the law is no excuse for the commission of a crime. The

third element was also clearly proven, thus completing the offense.

The Court therefore finds all defendants guilty as charged of violating Section 703 of Title 16 of the United States Code. The Collateral Forfeiture Schedule approved by this Court prescribes a fine of $250.00 for a violation of Section 20.21(i) of the Code of Federal Regulations. Each defendant is therefore hereby fined $250.00 and is ordered to deposit said sum within ten (10) days with the Clerk of this Court.

IT IS SO ORDERED.